(No. 6482

JEWELL MCDOUGLE, Personal Representative of JERRY WILLIAMS, Deceased, Claimant, *v.* STATE OF ILLINOIS, Respondent.

*Opinion filed October 30, 1978.*

GOLDENHERSCH & GOLDENHERSCH, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; HOWARD W. FELDMAN and DOUGLAS OLSON, Assistant Attorneys General, for Respondent.

HOLDERMAN, J.

Claimant is the duly appointed administrator of the Estate of Jerry Williams, deceased. Claimant seeks an award against the State in the sum of $25,000.00 based upon alleged negligence and willful and wanton misconduct of medical personnel at the State Penitentiary Facility at Menard, Illinois, in treatment of the decedent's injuries sustained as a result of an attack by a fellow inmate.

On the afternoon of February 3, 1971, a disturbance occurred at the prison among a certain group of inmates who had been assigned to clean the dining hall after dinner. While several inmates were still in the dining hall, inmate Sidney Bickham rushed in, stabbed one inmate, then chased inmate Jerry Williams until he caught up with him and stabbed him a number of times. Bickham then left the room but not before he had stabbed another inmate.

Sidney Bickham was ultimately tried and convicted of the murder of Jerry Williams, who died as a

result of stab wounds inflicted on him that February afternoon of 1971.

After being attacked by convict Bickham, inmate Williams was carried unconscious to the penitentiary's hospital. While in transit, inmate Williams bled profusely from a severe stab wound in the neck inflicted by Bickham. The inmate nurses had clamped the internal jugular vein which had been severed. This clamp appeared to stop further bleeding.

This incident occurred at approximately 5:00 p.m. on the day in question. Within five minutes after he was first notified of the incident, Lt. Anthony G. Gerulis, a guard at the Illinois Penitentiary, testified that he instructed a fellow guard to call Dr. Donald Wham, a prison physician. Dr. Wham arrived at the prison at about 5:45 p.m. When he arrived at the hospital, Dr. Wham went to the physician's dressing room and changed clothes before going to the operating room. When he arrived in the operating room, Williams was on the table with a surgical clamp on the jugular vein. It appears that at this time the bleeding was under control, the patient was responsive to questions, and was conscious.

Malcolm Little, an inmate serving as an assistant in the prison hospital, testified that when Dr. Wham entered the operating room, he took the clamp off the jugular vein and the decedent began to hemorrhage again.

Dr. Wham testified that he loosened the clamp that had prevented the bleeding and that the bleeding shortly began to continue freely. He stated he then attempted to replace the clamp and put pressure on the area but that the patient then went into a "shocky state" as a result of the rapid blood loss. Dr. Wham then

stopped the proceeding and requested that Dr. Schneider, the staff's consulting physician, be called at which time Dr. Wham testified "I more or less turned the case over to him."

There is some controversy as to whether or not Dr. Wham attempted to suture the jugular vein. Dr. Wham denied having tried to suture the vein and said "suturing a major vein in that area, is something I feel is somewhat out of my area of competence." However, in direct contradiction to this, Dr. Schnieder testified that Dr. Wham apparently did try to suture the vein before he arrived. After Dr. Schnieder examined the patient, he decided he should wait for the anesthetist. An anesthetist was called and arrived after some delay. She then attempted to anesthetize the patient by mask in order to prepare for an endotracheal anesthesia. She failed to obtain sufficient muscle relaxation in the patient in order to insert an endotracheal anesthetic device through the throat. At that time, an attempt was made to introduce an endotracheal tube despite the fact that the patient was not asleep. The anesthetist then began to intubate the decedent whereupon the decedent went into respiratory arrest, vomited and aspirated the vomit. Dr. Schnieder attempted an emergency tracheotomy but the patient died.

Dr. Schnieder testified that if the vein that had been severed had been completely tied off, the patient would have survived. He further testified that aside from the complications that arose when the anesthetist began to intubate the decedent, there were no other facts that he felt contributed to decedent's death.

The Respondent takes the position that the other wound, particularly the wound in the back that perforated the left lung and caused its collapse, was a major

factor in the cause of decedent's death and that the throat injury was not the proximate cause of death.

Dr. James McFadden, whose practice is limited to general surgery to the extent of 99 percent, was called as an expert witness. Dr. McFadden testified that in a case like the one involving the decedent, the first thing a doctor should do, where the blood vessel is clamped off, is to evaluate the situation, determine the severity of the injury, and make all preparations to repair with adequate help. The doctor testified that the clamp should not be removed until the physician was adequately prepared to cope with the situation, and that to remove the clamp that is impairing free bleeding would be "asking for trouble." With the large opening in the jugular vein, sound medical practice would be to just tie the vein off. McFadden went on to testify, that in a case of profuse bleeding from an injured vein, anesthetic is contra-indicated because it would tend to lower blood pressure that is already too low. Any anesthetics utilized should probably be a local anesthetic.

The testimony of inmates Little and Dye pertaining to Dr. Wham's state of sobriety need not be considered or evaluated in a decision of the case at bar. A careful review of the unfortunate scenario of events, which transpired at the Menard Penitentiary Hospital, more than adequately proved by a preponderance of the evidence that the agents of the State were at least negligent and that their negligence directly contributed to and caused the death of Claimant's decedent.

In the first place, it was shown by a preponderance of the evidence, that at the time Wham arrived at the prison hospital, Claimant's decedent was in fair condition. His blood pressure and respiration were stable and the bleeding from the severed jugular vein in his

neck had been stopped through the use of a clamp placed by James Hornbuckle, a medical assistant, who was present. When Wham removed clamp, he was likely to encounter and did encounter a situation that by his own testimony he could not handle. He stated that suturing a major vein, such as that in the present case, was beyond his area of competence; however, Dr. Schnieder testified that Dr. Wham had attempted to suture the vein.

Dr. Schnieder attempted to place "additional" sutures, but when he failed, decided to wait for a nurse anesthetist to arrive. Schnieder had elected to call for an endotracheal anesthetic. Prior to administering such an anesthetic, it was necessary to put the patient into a sound sleep. Dr. Schnieder knew that the pentothal was available at the prison hospital but did not inject the patient with pentothal even though he considered himself qualified to do so. The pentothal, according to Dr. Schnieder, was not administered to the patient because Dr. Schnieder did not feel qualified to intubate the patient in order to administer endotracheal anesthesia. Further, Dr. Schnieder said that he did not attempt to give the patient pentothal because the patient had to be monitored as to respiration and circulation, and that one person could not do that, even though Dr. Schnieder and Dr. Wham were present. Schnieder testified that at the time the anesthetist arrived, the patient's condition was fair and stable.

Instead of administering pentothal by injection, the anesthetist began to anesthetize the patient by mask preliminary to performing the endotracheal anesthesia. Dr. Schnieder testified that the patient must be in deep sleep in order to relax the muscles so that the endotracheal anesthesia can be administered. Although the patient could not be put to sleep with the gas

that was administered by the anesthetist, no attempt was made to inject pentothal and even though the placement of the tube in the patient's throat was contra-indicated and a very dangerous procedure, the nurse tried to place the tube in the patient's throat at the same time Schnieder was conducting an emergency tracheotomy. The tube inserted through the patient's mouth showed on the field of the tracheotomy. If the nurse anesthetist is to be believed, Claimant's decedent was dead at the time she arrived, and Dr. Schnieder and Wham were waiting for her to begin administering an anesthetic.

The record in this cause is lengthy. Most of the testimony was taken by deposition and submitted by stipulation as evidence. A careful consideration of the record leads to the inevitable conclusion that Claimant's decedent died directly as a result of not one act of negligence on the part of one individual, but as an unfortunate series of acts of negligence, any one of which might easily be found to have sustained an award to Claimant.

The uncontradicted medical testimony is to the effect that before the clamp which controlled the bleeding was removed, complete preparations for handling the situation after the removal of the clamp should have been made so the hemorrhaging could have been controlled. The evidence is overwhelmingly to the effect that no such preparations were made in this particular instance with the result that the patient died. There is also uncontradicted medical testimony to the effect that this vein could have been permanently tied off and the patient would have lived without any apparent difficutly.

Dr. McFadden testified that with wounds to the throat, such as those suffered by decedent, a correct

handling of the situation would be required as would more delicate suture material and instruments and everything else which very likely would not be available on an emergency basis. Dr. McFadden further testified that in the event clamps were removed without proper precautions being taken to prevent hemorrhaging, a situation could arise where the bleeding could start again and go out of control, which is exactly the situation that occurred in the present case. Dr. McFadden further testified to the danger in giving anesthesia to a patient who is in the condition the decedent was before his death. He testified there was considerable danger of shock with general anesthesia and that the anesthesia should have been local. This doctor repeatedly stated that the most important essential was the controlling of the bleeding and everything else was secondary.

Claimant called as a witness on her behalf one Dr. Vincent P. Perna who testified that, in his opinion, the deceased died as the result of a laceration of the internal jugular vein. Dr. Perna testified that he had performed approximately 2,000 post mortem examinations and was familiar with types of injuries as sustained by decedent. He also testified that the tying off of a segment of the jugular vein does not induce any serious complications. Dr. Perna, in response to questions by the attorneys for Respondent, stated that, in his opinion, the primary cause of death was the injury to the jugular vein and the bleeding as a result thereof.

It is clear that the negligent medical treatment of a prison inmate can result in liability against the State. In *Witte v. State of Illinois, 21 Ill. Ct. Cl. 173, 177,* the following appears:

"There is no question from the testimony in this case that the state was negligent in the treatment of Claimant, and in its failure to furnish competent medical services after it assumed responsiblity of caring for him."

In the case of *Witte v. State of Illinois,* the Court awarded Claimant monetary damages based upon the failure of penitentiary medical personnel to adequately treat an injured knee.

In *DeWeese v. State of Illinois,* Claimant sought damages based upon the negligence of a prison guard in providing adequate supervision in the prison vegetable house. Claimant's hand had been severly injured when a machine he was cleaning was turned on, apparently by other inmates. In sustaining an award in favor of Claimant against the State of Illinois, Justice Burks made the following observations:

"Claimant contends that the medical treatment and hospital care he received from prison officials and inmate nurses, following his injuries, were so grossly negligent that his permanent injuries, disabilities and his disfigurement were increased in severity; and that he endured unnecessary pain and suffering. If so, this would constitute a separate cause of action against the Respondent even if we had held the Respondent not liable for Claimant's original injury." *DeWeese v. State of Illinois, 28 Ill.Ct.Cl. 230, 236.*

It is clear that the Respondent owed a duty to Claimant's decedent to provide reasonable medical care for the injuries sustained by decedent. It was proven by a substantial preponderance of the evidence that such duty to provide reasonable care was breached by the Respondent through its agents; furthermore, the evidence clearly shows that the breach of Respondent's duty directly and proximately resulted in the death of Claimant's decedent.

Claimant's decedent had worked at odd jobs and was a student in high school. He expired shortly after his 20th birthday. Prior to that, he had been in the penitentiary approximately three months. He had averaged earning $40.00 to $45.00 per week from his odd jobs. The evidence is uncontradicted that he would take his earnings and give them to his mother, who

then gave him an allowance of $5.00 or $6.00 during the course of a week. The remainder of his earnings were used to buy groceries and to pay household bills. He planned to finish high school and obtain employment in order to help support his mother and siblings. As a student, Williams' grades were B's and C's.

It is clear that the State failed in its duty to provide adequate medical care to the deceased. It is also clear that the decedent did furnish some support to his mother and that decedent being the age of 20 years, it could be assumed that this support would continue.

An award is hereby entered in the amount of $25,000.00 in favor of Claimant.